## IN THE UNITED STATES DISTICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

1.  RITA CRAMPTON, Personal Representative
    of the Estate of Jane Ann Martin, deceased

         *Plaintiff,*

 v.

1.  BOARD OF COUNTY COMMISSIONERS
    OF PITTSBURG COUNTY, OKLA;
2.  CHRIS MORRIS, Sheriff of Pittsburg
    County, Oklahoma;
3.  OKLAHOMA DEPARTMENT OF
    CORRECTIONS;
4.  ABOUTANAA EL HABIT, Warden of Mabel
    Bassett Correctional Center;
5.  DOES I through X,

         *Defendants,*

Case No:  21-cv-00069-GKF-CDL

ATTORNEY LIEN CLAIMED

JURY TRIAL DEMANDED

### COMPLAINT

COMES NOW the Plaintiff, Rita Crampton ("Plaintiff"), as Personal Representative of the Estate of Jane Ann Martin ("Ms. Martin"), deceased, by and through her attorneys of record, and for her causes of action against the Defendants, alleges and states as follows:

### INTRODUCTORY STATEMENT

1.      Ms. Martin entered the Pittsburg County Jail on or around November 5, 2019 and was transported to Oklahoma Department of Corrections custody at Mabel Bassett Correctional Center, located in McCloud, OK, (hereinafter "Mabel Bassett" or "MBCC") on or around November 14, 2019. Ms. Martin died just a few hours after being transported from Pittsburg County Jail to Mabel Bassett.

1

2.     During Ms. Martin's detention at the Pittsburg County Jail, she notified jail personnel and medical personnel employed by the Pittsburg County Sheriff's Office ("PCSO"), of her serious health issues. Despite this knowledge, Defendants denied Ms. Martin of medical evaluation, treatment, and medications. PCSO failed to monitor her physical health and failed to provide her with adequate medical care. Defendants disregarded the known and obvious risk that severe harm could result to Ms. Martin if she was not evaluated, treated, and monitored for her medical issues on a timely and regular basis.

3.     During Ms. Martin's intake at Mabel Bassett, intake nurses and correctional staff should have immediately rendered medical treatment to Ms. Martin or sent her to a hospital for evaluation and treatment. Mabel Bassett operates an infirmary and provides medical care and treatment and has nurses and doctors on staff 24/7 and should have noticed and identified Ms. Martin's serious medical condition upon her intake and medical screening upon her arrival at Mabel Bassett.

4.     Ms. Martin's death was eminently preventable.  Her life could have been saved; her suffering could have been spared. While in the defendants' custody, Ms. Martin begged them for help. Other inmates sought help on her behalf, but the Defendants callously refused said treatment resulting in Ms. Martin's untimely death.

## JURISDICTION AND VENUE

5.     Paragraphs 1-4 are incorporated herein by reference.

6.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides

for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7.      The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Eighth Amendment and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

8.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1), as all parties are residents of the state of Oklahoma, and, at least one Defendant, i.e., Defendant Oklahoma Department of Corrections, resides in this this judicial district pursuant to 28 U.S.C. § 1391(c)(2) (*see* ¶ 13, *infra*).

## PARTIES

9.      Paragraphs 1 through 8 are incorporated herein by reference.

10.     Plaintiff, Rita Crampton ("Plaintiff"), is a citizen of Oklahoma and the duly-appointed Special Administratrix of the Estate of Ms. Martin. The survival causes of action in this matter are based on violations of Ms. Martin's rights under the Eight and/or Fourteenth Amendments and Oklahoma State Law.

11.     Defendant, The Board of County Commissioners of Pittsburg County, Oklahoma ("BOCC"), is a statutorily created governmental entity. 57 Okla. Stat. § 41 provides that"[e]very county, by authority of the *board of county commissioners* and at the expense of the county, shall have a jail or access to a jail in another county for the *safekeeping of prisoners lawfully committed*." (emphasis added).

12.     Defendant Chris Morris ("Sheriff Morris" or "Defendant Morris") is, and was at all times relevant hereto, the Sheriff of Pittsburg County, Oklahoma, residing in Pittsburg County, Oklahoma and acting under color of state law.  Defendant Morris, as Sheriff and the head of the Pittsburg County Sheriff's Office ("PCSO"), was, at all times relevant hereto, responsible for

ensuring the safety and well-being of inmates detained and housed at the Pittsburg County Jail, including the provision of appropriate medical and mental health care and treatment to inmates in need of such care, pursuant to 57 O.S. § 47.  In addition, Defendant Morris is, and was at all times pertinent hereto, responsible for creating, adopting, approving, ratifying, and enforcing the rules, regulations, policies, practices, procedures, and/or customs of the Pittsburg County Sheriff's Department and Pittsburg County Jail, including the policies, practices, procedures, and/or customs that violated Ms. Martin's rights as set forth in this Complaint.  Defendant Morris is sued in his individual and official capacities.

13.     Oklahoma Department of Corrections ("ODOC") is an Oklahoma Governmental Agency with offices/facilities located across the state of Oklahoma, and who was, in part, responsible for overseeing Ms. Martin's health and well-being, and ensuring Ms. Martin's medical needs were met, during the time she was in custody of ODOC (at Mabel Bassett Correctional Center).

14.     Defendant Aboutanaa El Habti ("El Habti") was, at all times relevant hereto, the Warden at Mabel Bassett in charge of the operations and supervision of Mabel Bassett employees and the individuals in her custody.  During the acts and omissions complained of herein, she was acting in such capacity as the agent, servant and employee of the ODOC. Aboutanaa El Habti is sued individually and in her official capacity.

15.     The true names and identities of Defendants DOES 1 through X are presently unknown to Plaintiff.  Plaintiff alleges that each of Defendants DOES I through X was employed by the PCSO and/or ODOC. Plaintiff alleges that each of Defendants DOES I through X was deliberatively indifferent to Ms. Martin's medical needs and safety, violated her civil rights,

negligently and wrongfully caused her injuries, and/or encouraged, directed, enabled and/or ordered other Defendants to engage in such conduct.

## **FACTUAL ALLEGATIONS**

16.     Paragraphs 1 through 15 are incorporated herein by reference.

**A. MS. MARTIN'S DEATH**

17.     Ms. Martin was taken into custody by the PCSO on November 5, 2019 for alleged parole violations. As a result of her violations, Ms. Martin was sentenced to 6 months in the custody of the Oklahoma Department of Corrections ("ODOC").

18.     Ms. Martin was scheduled to serve her time with the ODOC at Mabel Bassett Correctional Facility ("Mabel Bassett") in McCloud, Oklahoma. However, Ms. Martin was taken to the Pittsburg County Jail on November 5, 2019, whereby she would later be transferred to Mabel Bassett.

19.     Ms. Martin was booked into Pittsburg County Jail at approximately 4:52 p.m. on November  5, 2019.

20.     Upon being admitted into the Pittsburg County Jail, Ms. Martin began immediately complaining of pain in her side, difficulty breathing, and a general feeling of sickness.

21.     Throughout her time at Pittsburg County Jail, Ms. Martin repeatedly notified jail staff and other inmates of the excruciating chest pain she was experiencing .

22.     After jail staff failed and/or refused to provide Ms. Martin medical treatment she began to contact her friends and family to ask for help because of the pain she was experiencing.

23.     For instance, on November 13, 2019, Ms. Martin called her father where she expressed to him her symptoms and that Pittsburg County Jail employees had not referred her to see a doctor.

24.     During her period of custody at Pittsburg County Jail, Ms. Martin notified Defendants and/or Defendants otherwise had knowledge of her serious medical condition and needs.

25.     At no time while Ms. Martin was in the custody and/or care of the PCSO was a plan entered to monitor Ms. Martin's persistent symptoms, no diagnostic testing was performed or ordered for Ms. Martin, a medical doctor was never consulted about Ms. Martin's condition or symptoms, nor was Ms. Martin transferred to an outside provider for specialized medical evaluation and services.

26.     Ms. Martin languished at the Pittsburg County Jail for 8 days before being transported into ODOC custody at Mabel Bassett Correctional Center on November 14, 2019.

27.     Ms. Martin arrived at Mabel Bassett at approximately 9:50 A.M. At approximately 10:00 A.M. Officer Tabitha Lane conducted a visual body search whereby Officer Lane observed that Ms. Martin was having trouble breathing. When Officer Lane asked Ms. Martin about her breathing problems, Ms. Martin informed her that she had been having health problems while at Pittsburg County Jail but was not provided medical treatment. Officer Lane advised Nurse Kathryn Burton of Ms. Martin's breathing trouble.

28.     Based on the intake screening alone, it was clear that Ms. Martin required an immediate referral to a physician and close medical monitoring. Nonetheless, and in spite of her serious medical history and acute injuries, the responsible Mabel Bassett personnel failed to place Ms. Martin in an area of the Jail for more frequent observation and provided her with little to no medical care or monitoring. She was never set for an appointment with a physician. Rather, with deliberate indifference, Mabel Bassett personnel placed Ms. Martin in a general population pod with no medical treatment or assessment plan in place.

29.     At approximately 11:00 A.M. Ms. Martin was observed by Nurse Burton. Ms. Martin informed Nurse Burton that she felt like she had the flu. Ms. Martin again expressed that she had made numerous requests to see a doctor while incarcerated at the Pittsburg County Jail but was denied the opportunity.

30.     At approximately 12:30 Nurse Burton observed Ms. Martin shivering in her cell with a blanket covering her head.

31.     Nurse Practitioner Karen Barnor took Ms. Martin's vitals at approximately 1:20 P.M. and noted that her vital signs were extremely elevated. Barnor noted cardiac tachycardia and ordered clonidine for elevated blood pressure, and 1000 mg. Tylenol for elevated temperature, and an IV for her elevated heart rate. Martin was placed in the medical unit for observation and monitoring.

32.     At approximately 3:15 P.M., as Ms. Martin's condition continued to decline, Nurse Barnor ordered an ambulance for Ms. Martin to be transported to an emergency room.

33.     At approximately 3:30 P.M. Ms. Martin was heard having difficulty breathing and was taken to an infirmary cell. Medical staff ordered 50 mg of Vistaril to help her breathing. Ms. Martin continued to struggle with her breathing even after receiving oxygen. The ODOC nursing staff reported that Ms. Martin appeared diaphoretic, pale, lethargic, and clammy.

34.     Paramedics arrived at Mabel Bassett and immediately began performing CPR on Ms. Martin. The paramedics left Mabel Bassett for the emergency room at approximately 4:25 P.M.

35.     At 7:02 P.M., just hours after arriving at Mabel Bassett, Ms. Martin was pronounced dead by St. Anthony's Hospital physicians.

36.     It was later determined that Ms. Martin died of right coronary artery ostium occlusion, due to vegetations of the aortic valve, due to chronic bacterial endocarditis.

**B. ENDOCARDITIS: A MEDICAL EMERGENCY**

37.     Paragraphs 1 through 36 are incorporated herein by reference.

38.     Infective endocarditis is a life-threatening, but treatable, infection of the heart, usually involving one of the valves. The infection results in the growth of a "vegetation" of infected material on the surface of the valve. Pieces of the vegetation can break off and lodge in the tissues of the lungs, creating septic emboli and cavitary lesions of the lungs.

39.     Signs and symptoms of infective endocarditis consequently can include fever, a new or changed heart murmur, flu-like symptoms, fatigue or weakness, rapid heart rate, weight loss, and chest pain.

40.     When such symptoms are present on examination, generally accepted medical standards of care call for immediate evaluation by a medical doctor and diagnostic testing, including a chest x-ray, basic laboratory testing of blood, urine specimens, and an echocardiogram.

41.     Persons who receive such care for infective endocarditis can be expected to make a complete recovery.

42.     If treatment is delayed, however, the condition will ultimately result in organ failure and death.

43.     Ms. Martin repeatedly told jail staff and medical personnel at the Pittsburgh County Jail that she was in pain and was having pain in her chest and having trouble breathing and was exhibiting flu like symptoms. Ms. Martin's complaints should have put medical staff and detention officers on high alert.

44.     Infective endocarditis is a well-known complication of intravenous drug use because needles often serve as a vector for infection.

45.     Due to the high population of intravenous drug users in the prison environment, reasonably trained staff members must be aware of the signs and symptoms of infective endocarditis.

46.     Had Ms. Martin received appropriate medical treatment while in the Defendants' custody, she would have survived and been spared conscious pain and suffering.

47.     Notwithstanding Defendants' knowledge of Ms. Martin's history and symptoms, Defendants failed to monitor her, perform any diagnostic testing, report her condition to a medical doctor, or to transfer her for outside medical services until it was too late.

48.     As a result of Defendants' actions and inactions, Ms. Martin's infective endocarditis condition, which was treatable with antibiotics or surgery, was greatly aggravated and caused her death.

## C.  DEFENDANTS' DEFECTIVE HEALTH CARE POLICIES

49.     Paragraphs 1 through 48 are incorporated herein by reference

50.     Defendants knew (either through actual or constructive notice) of Ms. Martin's serious health issues and complaints of serious medical needs. Defendants knew Ms. Martin's health was fragile and that her condition was likely to deteriorate and should have been treated with the utmost care and precaution.

51.     Nonetheless, during the time period Ms. Martin was in the custody and care of PCSO, her health condition was not monitored, and she did not receive proper medical care or assessments.

52.     Ms. Martin repeatedly complained to jail staff and medical personnel that she was experiencing severe chest pains and having trouble breathing. Those symptoms alone should have put medical staff and detention officers on high alert.

53.     Notwithstanding Defendants' knowledge of Ms. Martin's history and symptoms, Defendants failed to monitor her, perform any diagnostic testing, report her condition to a medical doctor, or to transfer her for outside medical services until it was too late.

54.     As a result of Defendants' actions and inactions, Ms. Martin's infective endocarditis condition, which was treatable with antibiotics or surgery, was greatly aggravated and caused her death.

55.     Defendants' deliberate indifference to Ms. Martin's serious medical needs was in furtherance of and consistent with: (a) policies, customs and/or practices which Chris Morris and/or El Habti promulgated, created, implemented or possessed responsibility for the continued operation of; and (b) policies, customs and/or practices which BOCC and/or ODOC had responsibility for implementing and which BOCC and/or ODOC assisted in developing.

56.     There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at both the Pittsburg County Jail and Mabel Bassett. Chris Morris, the BOCC and/or El Habti and ODOC have long known of these systemic deficiencies and the substantial risks to inmates like Ms. Martin but have failed to take reasonable steps to alleviate those deficiencies and risks.

57.     Such policies, practices and/or customs include, but are not limited to:

a.     Understaffing (i.e., no access to an on-site physician);

b.     Severe limitation of the use of off-site medical and diagnostic service providers, even in emergent situations;

    c.   Refusing to send inmates with emergent needs to the hospital for purely financial purposes;

    d.   Untimely medical examinations and treatment;

    e.   Inadequate training (i.e., training and encouraging medical personnel and detention staff to assume that inmates are faking illness/injury or malingering);

    f.   Maintaining job duties that require jailers to report emergent medical conditions in the absence of training to identify emergent conditions;

    g.   Adopting a chain of command that lacked supervision; and

    h.   Utterly inadequate medical supervision of staff and inmates

58.    At all times relevant, Sheriff Morris and/or Warden El Habti, with deliberate indifference, further failed to properly train, supervise, and discipline medical personnel at the Pittsburg County Jail and/or Mabel Bassett so as to ensure that detainees would receive appropriate care and monitoring for serious illnesses and, if necessary, diagnostic testing, referral to a medical doctor, and/or outside medical services.

59.    Upon information and belief that will be confirmed through discovery, there is a well-established policy, practice and/or custom of understaffing the Pittsburg County Jail and/or Mabel Bassett with undertrained and underqualified medical personnel who are ill equipped to evaluate, assess, supervise, monitor or treat inmates, like Ms. Martin, with serious medical needs.

60.    As alleged herein, there are deep-seated and well-known policies, practices and/or customs of systemic, dangerous, and unconstitutional failures to provide adequate medical care to inmates at the Pittsburg County Jail and/or Mabel Bassett. This system of deficient care, which evinces fundamental failures to train and supervise medical and detention personnel, created substantial, and obvious known risks to the health and safety of inmates like Ms. Martin.  Still,

11

Defendants BOCC, ODOC, Morris, and/or El Habti failed to take reasonable steps to alleviate the risk to inmate health and safety, in deliberate indifference to Ms. Martin's serious medical needs.

## CLAIM FOR RELIEF

### Cruel and Unusual Punishment in Violation of the Eighth and Fourteenth Amendments to the Constitution of the United States
### (42 U.S.C. § 1983)

**A. ALLEGATIONS APPLICABLE TO ALL DEFENDANTS**

61.     Paragraphs 1 through 60 are incorporated herein by reference

62.     Defendants knew (either through actual or constructive knowledge) that Ms. Martin had serious medical needs.

63.     As described supra, Ms. Martin had serious and emergent medical issues that were known and obvious to the PCSO and ODOC employees/agents who came into contact with her. It was obvious that Ms. Martin needed immediate and emergent evaluation and treatment in an emergency room setting, but such services were denied, delayed and obstructed. The PCSO and ODOC employees/agents who came into contact with Ms. Martin disregarded the known, obvious and substantial risks to her health and safety.

64.     Defendants failed to provide an adequate physical health evaluation on a number of occasions and failed to provide timely or adequate medical treatment for Ms. Martin while she was placed in the custody and care of both the Pittsburg County Jail and Mabel Bassett.

65.     Defendants' acts and/or omissions of indifference as alleged herein, include but are not limited to their failure to treat Ms. Martin's serious medical conditions; failure to conduct appropriate medical health assessments; failure to promptly evaluate Ms. Martin physical health; failure to create and implement appropriate medical health treatment plans; failure to provide

access to medical personnel capable of evaluating and treating her serious health needs; and a failure to take precautions to prevent Ms. Martin from further injury.

66.     As a direct and proximate result of this deliberate indifference, as described above, Ms. Martin experienced unnecessary physical pain, a worsening of her condition, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment and the eventual loss of her life.

67.     The aforementioned acts and/or omissions of the Defendants were malicious, reckless and/or accomplished with a conscious disregard of Ms. Martin's rights thereby entitling Plaintiff to an award of exemplary and punitive damages.

**B.   SUPERVISOR LIABILITY (SHERIFF MORRIS AND WARDEN EL HABTI)**

68.     Paragraphs 1 through 67 are incorporated herein by reference

69.     Ms. Martin was wrongfully, unlawfully and unnecessarily denied medical care and treatment at both the Pittsburg County Jail and Mabel Bassett as a direct result of the inadequate and indifferent training which trained jailers to disregard emergent medical conditions like the one suffered by Ms. Martin. This inadequate and/or lack of training was the moving force behind the conduct of the Defendant jailers in delaying and denying medical treatment for Ms. Martin.

70.     There is an affirmative causal link between the aforementioned acts and/or omissions of Defendants in being deliberately indifferent to Ms. Martin's serious medical needs, health and safety (and violation Ms. Martin's civil rights) and the policies, practices and/or customs described herein which Sheriff Morris promulgated, created, implemented and/or possessed responsibility for.

71.     Sheriff Morris and/or Warden El Habti knew (either through actual or constructive knowledge), or it was obvious, that these policies, practices, and/or customs posed substantial risks

to the health and safety of inmates like Ms. Martin.  Nevertheless, Sheriff Morris and/or Warden El Habti failed to take reasonable steps to alleviate the risk of deliberate indifference to inmates', including Ms. Martin's, serious medical needs.

72.     Sheriff Morris and/or Warden El Habti tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

73.     There is an affirmative causal link between aforementioned policies, practices and/or customs and Ms. Martin's injuries and damages as alleged herein.

### C.  MUNICIPAL/"MONNELL" LIABILITY (BOCC AND ODOC)

74.     Paragraphs 1 through 73 are incorporated herein by reference.

75.     The aforementioned acts and/or omissions of the BOCC and/or ODOC in being deliberately indifferent to Ms. Martin's health and safety violating Ms. Martin's civil rights are causally connected with customs, practices, and policies which the BOCC and/or ODOC promulgated, created, implemented and/or possessed responsibility for.

76.     Such policies, customs and/or practices are specifically set forth in paragraphs 49-60, *supra*.

77.     The BOCC and/or ODOC had knowledge (either actual or constructive knowledge), or it was obvious, that its health care policies, practices and/or customs in place at the Jail posed substantial risks to the health and safety of inmates like Ms. Martin.

78.     Specifically, the medial staff at the Pittsburg County Jail and/or Mabel Bassett was insufficiently trained and supervised.  The undertrained and under-supervised medical staff at the Pittsburg County Jail and/or Mabel Bassett lacked the ability to properly diagnose and treat patients, like Ms. Martin with complex or life-threatening medical conditions. Further, the medical policies, guidelines, and protocols in place at the Pittsburg County Jail and/or Mabel Bassett were

inadequate to assure that patients, like Ms. Martin, with complex or life-threatening medical conditions, received prompt and necessary care.  Further, the BOCC and/or ODOC failed to take reasonable steps to alleviate those risks with deliberate indifference to inmate's serious medical needs, including Ms. Martin's serious medical, needs.

79.     The PCSO and ODOC tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein, knew that such conduct was unjustified and would result in violations of constitutional rights, and evinced deliberate indifference to prisoners' serious medical needs.

80.     There is an affirmative causal link between aforementioned acts and/or omission in being deliberatively indifferent to Ms. Martin's serious medical needs, health and safety and violating Ms. Martin's civil rights, and the polices practice and/or customs described herein which the BOCC and/or ODOC, promulgated, created, implemented and/or possessed, and Ms. Martin's injuries and damages as alleged herein.

**WHEREFORE,** based on the foregoing, Plaintiff prays that this Court grant the relief sought including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

SMOLEN LAW, PLLC

/s/Donald Smolen, II
Donald E. Smolen, II, OBA #19944
Laura L. Hamilton, OBA #22619
Dustin Vanderhoof, OBA #21388
Jack Warren, OBA# 33635
611 S. Detroit Ave.
Tulsa, OK  74120
Tel:  918-777-4529
Fax:  918-890-4529
www.smolen.law
don@smolen.law
laura@smolen.law
dustin@smolen.law
jack@smolen.law

*Attorneys for Plaintiff*